**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Ronald Evans,

     Plaintiff,

          v.

                                 Case No. 1:11cv813

City of Cincinnati, *et al.*,                Judge Michael R. Barrett

     Defendants.

**OPINION & ORDER**

     This matter is before the Court upon Defendant Kevin Campbell's Motion for Summary Judgment (Doc. 14) and Defendant the City of Cincinnati's Motion for Summary Judgment (Doc. 15).   The motions have been fully briefed.   (Docs. 28, 29, 30, 31.)

**I.**    **BACKGROUND**

     Plaintiff is an African American who was formerly employed as a firefighter by the City of Cincinnati.   Plaintiff brings claims of race discrimination, retaliation, and hostile work environment based on race.   Plaintiff's claims are brought pursuant to Title VII, 42 U.S.C. § 2000e and Ohio Revised Code § 4112.02 against the City of Cincinnati and Kevin Campbell.   The Court has attempted to organize the jumble of facts presented by the parties into categories which relate to each of these claims.

    **A.**  **Work history**

     From 2000 to 2005, Plaintiff's immediate supervisor was Lieutenant Douglas Hoover.[1]   In October of 2005, Plaintiff filed a charge of discrimination against Hoover.

---

[1] The parties have done little to explain the leadership hierarchy of the Fire Department or

(Doc. 18, Ronald Evans Dep., Ex. 18.)   Hoover requested that he be transferred because he could no longer work with Plaintiff.   (Doc. 20, Kevin Campbell Dep., Ex. 9)   Beginning in 2006, Plaintiff's immediate supervisor was Lieutenant Mark Broach.   (Doc. 28, Ex. 14, Excerpts of Mark Broach Dep. at 6.)[2]   Broach is African American.

Beginning in 2001, Defendant Kevin Campbell was the captain of Engine Company 34, where Plaintiff worked.   (Campbell Dep. at 54.)   During this time, Campbell was first supervised by District Chief Stephen Kluesener (Doc. 22, Stephen Kluesener Dep. at 8, 10), but was later supervised by District Chief Ronald Texter (Doc. 23, Ronald Texter Dep. at 6, 16).

### B. Performance Reviews

Plaintiff claims that the negative comments made on his annual performance reports were false.[3]   From the record, it appears that the performance reports were due in April of each year, but cover the employee's performance for the previous year.   For sake of clarity, the Court will refer to each report by the date on the report.

### 1. 2006

On his April 1, 2006 performance report, Plaintiff was given an overall rating of 80, which is considered "Normal."   (Evans Dep., Ex. 12.)   Plaintiff was rated a zero in "Rules & Regulations – Knowledge & Adherence."   (Id.)   Comments on the performance report include:

provide the Court with a timeline of when and where different employees were working.   The Court has done the best it could based on its own reading of the depositions filed in this matter.

[2]The parties failed to provide the Court with a full copy of Mark Broach's deposition.

[3]Plaintiff also claims that his signature is forged on a performance review dated April 1, 2003.   (Doc. 28, Evans Aff., ¶ 5.)

Member has been off sick 4 times in the past year.

Member thinks he is being picked on when given duties to do or constructive criticism.

Member continually late on paying off, usually 4 or 5 or more pays behind.

(Id.)   The report is signed by Randal Freel as the reviewer and signed by Hoover as the appraiser.   (Id.)

Plaintiff has explained that under City policy, any rating less than an 80 will prevent a promotion.   (Evans Aff., ¶ 9.)   However, Plaintiff has not provided any support for this statement.

### 2. **2007**

Broach testified that Plaintiff's review in 2007 was supposed to be completed by him and reviewed by Kluesner.   (Broach Dep. at 53-54.)   However, according to Broach, Campbell prepared the evaluation, and insisted that Broach sign it.   (Broach Dep. at 51-53.)

There are two performance reports dated April 1, 2007 in evidence.   On the first report, Plaintiff was again given an overall rating of 80 and rated a zero in "Rules & Regulations – Knowledge & Adherence."   (Evans Dep., Ex. 11.)   Comments on the performance report include:

Member used over 200 sick hrs in 2006.

Continues to have personnel [sic] issues with fellow firefighters.

Received written reprimand for not following procedures and making appropriate payoffs.

(Id.)   The performance report is not signed by a reviewer or an appraiser, but includes

3

the typewritten name of Broach as the appraiser.   (Id.)

The second performance report dated April 1, 2007 gives Plaintiff an overall rating

of 80 and no zeros in any category.   (Doc. 28, Ex. 7.)   Comments include:

Member received counseling for A.W.O.L. on 1/17/07.

Filed unsubstantiated charges against supervisor after receiving reprimand
in 2005.

Does not work well with others.

Does not accept personal responsibility when in violation of CPD
procedures.

(Id.)   In the section for "Reviewer's Comments" it states: "Revised performance report.

Previous report included 1st 3 months of 2006."   (Id.)   The performance report is not

signed by a reviewer or an appraiser, but includes the typewritten name of Broach as the

appraiser.   (Id.)

There is some explanation in the record for this second report.   On June 13, 2007,

Campbell sent Broach an email with a revised performance report.   (Evans Dep., Ex.

29.)   The email states:

Attached you will find an updated performance report for FF Evans.
Initially, his performance report was based on January to December
evaluation.   Chief Texter has pulled the original and is awaiting the revised
report.   The corrected version includes the 1st three months of 07 and a
counseling for AWOL in January which was not included in the 1st
submitted report.   FF Evans will probably deny the AWOL occurred.

Again, Lt Broach if you are uncomfortable with any marks feel free to
change and correct.   Regardless of your actions, you will not please FF
Evans unless he is rated outstanding.   I understanding now he has
threatened you with charges and myself if his ratings don't improve ????
You may wish to remind FF Evans that his performance improves 1st, then
his evaluations improve.   That's how it works.

4

Remember, performance reports are not about pleasing, but identifying performance and behavior that is not conducive to effective company operations. I do hope your discussion with FF Evans will motivate him to be outstanding.

(Id.)

Regarding the 2007 review, Broach explained:

What I remember about the 2007 performance rating was this is probably the third or fourth remake of Ron Evans' 2007 [evaluation].

 . . .

Captain Campbell, the initial one – I just remember the initial one specifically that he made and gave to me to sign. It had information that was 5, 6, 7, 8 years old about – that reflected Ron's disciplinary history on there. So he gave me the performance rating, and I gave it to Ron to sign, and Ron immediately knew that I had not done the appraisal.

Q: Did he tell you that?

A: Yes. He asked me, he says, this has – this has something I did seven years ago. You weren't here seven years. I had only been there six months. I had to answer to that.

(Broach Dep. at 52.)

Campbell admits that he gave Broach advice on evaluating Plaintiff in 2007.

(Campbell Dep. at 162-65.) However, Campbell explains that he created the report at

Broach's request because he was new to the company. (Id. at 165.) Campbell also

admits that he sent Broach an email in 2007 which stated:

Performance reports are do [sic]. Leave them in my mailbox or a secure place I can get to them I will be out of town until the 16th. Evans performance report will note SWP usage, Tardy, and Discipline Issues this past year. If you need to contact me, I am available via cell phone or e-mails.

(Campbell Dep. at 140.) However, Campbell testified that this was common and he

5

would have sent similar emails with regards to other employees.   (Id. at 139-140.)

### 3. **2008**

Plaintiff did not receive an evaluation in 2008.   (Evans Dep. at 89, 91.)

### 4. **2009**

Plaintiff did not receive his April 1, 2009 performance report until June 10, 2010. (Doc. 19, Evans Dep. at 260.)[4]   Plaintiff was given an overall rating of 70, which is "Marginal."   (Evans Dep., Ex. 3.)   On the report, Plaintiff was rated a zero in three areas: "Attendance – frequency & nature of absences," "Rules & Regulations – Knowledge & Adherence," and Tactical Firefighting Skills – knowledge & use."   (Id.)   Comments on the performance report include:

> Firefighter Evans is not in the best of shape, his uniform and shoes are usually unkept.
>
> Firefighter missed more work days this year than in whole career.
>
> Firefighter has repeated [sic] ignored established rules and regulations.
>
> At most working Fires, Firefighter Evans cannot be located.

(Id.)   The performance report also includes a handwritten comment: "F.F. Evans was inadequate in [ ] attitude, initiative and [ ] team building.   (Id.)   F.F. Evans attendance was so poor over the course of year it alone would merit a rating of Inadequate for overall appraisal."   (Id.)   The performance report is signed by Stephen Kluesener as the reviewer.   (Id.)   Broach's name also appears on the report at the appraiser, but it is not signed by him.   (Id.)   As a result of this performance report, Plaintiff went on stress leave

---

[4]Plaintiff was on an extended sick leave from October of 2008 to January of 2009.   (Doc. 19, Evans Dep. at 253.)   Plaintiff was on leave again from March to August of 2010 due to a car accident which occurred while he was off-duty.   (Evans Dep. at 175-79.)

on July 3, 2010. (Evans Dep. at 24.)

Plaintiff claims that Campbell also participated in Plaintiff's 2009 review and Broach did not participate or agree with the review. (Evans Dep. at 21- 24.) Plaintiff notes that Kluesener worked at another station and would have had to rely on Campbell for information. (Evans Dep. at 94-95.)

In his affidavit, Broach states that he was not contacted by Kluesener regarding the review and he did not participate in the review. (Doc. 28, Ex. 29, ¶ 10.) Broach states that he does not agree with the review. (Id.) For example, Broach testified that he did not agree with the comment that Plaintiff "repeatedly ignored established rules and regulations." (Doc. 28, Ex. 13, Excerpts of Mark Broach Dep. at 71-72.) Broach also testified:

> I had spoke with Kluesener. This was the year that myself, Ron and Kluesener were going to sit down and let him know where all this was coming from. I just needed it to stop. I did not want to participate in this anymore, and if Kluesener was going to let Kevin Campbell do Ron's performance ratings, then he's the district chief.

(Broach Dep. at 68.)

On February 9, 2010, Plaintiff filed charges against Campbell, explaining: "Over the last few years I have received less than favorable performance ratings with derogatory remarks that were not true. According to documents I have obtained, immediate supervision is being coerced and even ordered by the Captain to place comments, and to give low marks on my rating each year." (Doc. 28, Ex. 34.)

### C. <u>Harassment and Hostile Work Environment</u>

Plaintiff also claims that from the time Campbell became the captain of Engine

Company 34, Campbell continually harassed him, or requested others to harass him. Plaintiff claims that this harassment created a hostile work environment. Plaintiff cites multiple examples of alleged harassment by Campbell. Broach has stated in an affidavit that when he began working at Engine Company 34, Campbell told him that Plaintiff was one of the worst firefighters, and he intended to discipline Plaintiff so he would be terminated. (Doc. 28, Ex. 29, ¶ 3.) The Court will recount these examples chronologically.[5]

Plaintiff states that in 2003, Campbell accused Plaintiff of not using a hose properly, but did not say anything to Chad Maly, who is a Caucasian employee. (Evans Dep. at 43-44.)

On September 23, 2003, Campbell submitted a written report charging Plaintiff for insubordination and stated that "I feel that it would benefit FF Evans, and be in his best interest, that he be sent to P[ublic] E[mployees] A[ssistance] P[rogram] or some other program where he can learn to manage his attitude." (Campbell Dep., Ex. 5.) Campbell also stated:

> Based on his actions in the past . . . it is not illogical to assume he will attempt to divert his responsibility again. In the past FF Evans has used race as an issue. This issue should be eliminated now, by putting FF Evans under the direct supervision of an African American Fire Officer. If an attempt to move or place FF Evans is made after accusations are made, it would take on the appearance of retaliation. If professional help or counseling is mandated after such an accusation, this would appear as retaliation also. Bottom line is FF Evans would not receive the proper attention needed. His immediate supervisor is on limited duty and there has been conflict there also.

---

[5]Even though Campbell became the captain of Engine Company 34 in 2001, Plaintiff does not cite any examples from the 2001 to 2002 period of time.

(Id.)   The report concludes by explaining that Plaintiff received a verbal counseling for insubordination from Campbell.   (Id.)   Campbell testified that Plaintiff was the only employee he ever asked to be sent to PEAP.   (Campbell Dep. at 237.)

In 2005, Campbell issued Plaintiff a written reprimand for being late on payments into the house fund.   (Evans Dep. at 11.)   However, Plaintiff claims that he had paid what he owed almost fourteen days before the reprimand was given.   (Id.)   The City states that there is no record of this reprimand.   (Doc. 15, at 14.)

There is a record that on July 14, 2005, Hoover issued Plaintiff a written reprimand. (Evans Dep., Ex. 17.)   Hoover explains that Campbell instructed Plaintiff to clean out his email inbox because messages to his address were being returned as undeliverable. (Id.)   Plaintiff told Campbell that he had done so the day before.   (Id.)   However, when Plaintiff opened his inbox in front of Hoover, Hoover noticed that there were twenty-one pages of mail and Plaintiff had not cleaned out his email inbox.   (Id.)   Plaintiff claimed that he cleaned out the inbox but did not empty it.   (Evans Dep., Ex. 19.)

Plaintiff claims that beginning in 2006, he was treated differently than Caucasian firefighters with regard to sick leave.   Plaintiff explains that when he took sick leave, Campbell subjected him to questions about his paperwork.[6]   Plaintiff relies on Broach's testimony that when a Caucasian firefighter, Steve Grauel, took sick leave without a note, Campbell said it was not a problem.   (Broach Dep. at 15.)   The City responds that under the collective bargaining agreement, an employee must provide a doctor's note after "four

---

[6]Plaintiff also points out that on June 9, 2010, Kluesner requested sick leave balances for Broach and Plaintiff and sent them to Campbell.   (Doc. 28, Ex. 19.)   Plaintiff makes an unsupported statement that Kluesner did not request sick leave balances for any other employees.

(4) or more instances o[f] greater than seventy-two (72) hours of sick-leave [ ] within a rolling twelve (12) month period."  (Doc. 32-1.)   The City notes that Broach testified that he did not know how long either Grauel or Evans were off.   (Broach Dep. at 16.)

On September 20, 2007, Campbell issued Plaintiff a written reprimand for being late on payments into the house fund.   (Evans Dep., Ex. 20.)   Plaintiff does not dispute that he was late on making those payments.  (Evans Dep. at 69.)   Campbell testified that other employees were also late from time to time, but after Campbell mentioned it to them, they would pay within a few days.  (Campbell Dep. at 41.)   Campbell explained that Plaintiff was the only employee who refused to pay and for whom he issued a written reprimand.   (Id. at 46.)

On October 11, 2008, a travelling officer, Lieutenant Sherman Smith, charged Plaintiff with insubordination.  (Evans Dep., Ex. 24.)   In the written report, Smith explains that he was securing the firehouse for night watch and noticed Plaintiff was on the bench outside the firehouse talking to two males.  (Id.)   Smith asked Plaintiff to come inside and informed him that there should not be any visitors after 8:00 p.m.   (Id.) Smith explains that Plaintiff returned to the bench and refused to come inside even after Smith asked him to come inside several times.  (Id.)   Smith explains that Plaintiff eventually brought his guests around to the front of the house. (Id.)   Smith explains that when Smith told Plaintiff that he was issuing a direct order, Plaintiff told him, "If you have to put me on paper then do it."   Plaintiff did not dispute the facts (Evans Dep., Ex. 22), but filed his own charges against Smith because according to Plaintiff, "[t]he manner in which Lt. Smith expressed himself was not only offensive, but also very unprofessional and

10

disrespectful to my guests on that evening." (Evans Dep., Ex. 23.) Plaintiff has also not disputed that having guests at the firehouse at that hour was not allowed.

After Smith filed the charges, Campbell sent an email to Smith stating: "It is unfortunate that a travelling officer has to deal with an insubordinate attitude from a co-worker. FF Evans has a history of such behavior and his F-47 [charges filed against Smith] speaks for itself. I will forward previous documentation about FF Evans attitude to support you." (Doc. 28, Ex. 37.)

In 2008, Plaintiff claims that he was denied a transfer, and when other employees alleged racial harassment, they were granted transfers.[7] However, Campbell explains that the transfer was approved but because the wrong form was used, Plaintiff needed resubmitted the request. (Campbell Dep. at 123-24.) Campbell explained that Plaintiff never resubmitted the proper form. (Id. at 124.)

On October 24, 2009, Plaintiff filed a grievance because the City required him to submit his private medical records to Employee Health Services and Chief Texter before he would be allowed to return to duty. (Doc. 28, Ex. 20.) The grievance was denied. (Id.)

In 2009, Campbell was transferred to another unit for a period of time. (Doc. 28, Ronald Evans Aff. ¶ 2; Evans Dep. at 61.) Plaintiff explains that the harassment stopped during this period of time. (Evans Aff. ¶ 2.) However, Campbell returned to Plaintiff's unit around March of 2010. (Evans Dep. at 61.)

In 2010, Plaintiff claims that Texter required Plaintiff to provide him with medical

---

[7]Plaintiff has not produced a document showing that this request was made. The City disputes whether any request was made.

release before he could begin any sessions with the social worker in the Public Employee Assistance Program.   (Evans Dep. at 119-120.)   Plaintiff claims that under the release, any discussions between the psychologist and Plaintiff would be released.   (Id. at 120.)

Plaintiff claims that throughout his employment, Campbell would inform Plaintiff of complaints made by Caucasian employees in other units.   Plaintiff claims that he would tell Campbell that the complaints were not true, but Campbell would not believe him. (Evans Dep., at 44-45.)

### D.  Retaliation

While he was employed by the City, Plaintiff filed multiple charges of discrimination and retaliation.   (Evans Dep. at 8.)   Plaintiff claims that the poor ratings he received on his performance reports were in retaliation for three of the charges he filed.

The first charge was filed on October 7, 2000 with the Ohio Civil Rights Commission.   (Evans Dep. at 8; Doc. 28, Ex. 23.)   As a result of the charge, the City agreed to remove three written reprimands from Plaintiff's file.   (Campbell Dep., Ex. 35.) Two of these reprimands were issued by Hoover.   (Id.)

The second charge was filed on October 24, 2005 with the Ohio Civil Rights Commission.   (Doc. 28, Ex. 23.)   Plaintiff claimed that the City subjected him to harassment and a hostile working environment based on race and in retaliation for the charge filed in 2000.   (Id.)[8]   Plaintiff claimed that he received negative comments on his performance evaluation.   (Id.)   Plaintiff claimed that even though the City knew that he has issues with Hoover, they did not address the problem, and instead requested that he

---

[8]Plaintiff claimed that he was required to travel between fire units.   (Evans Aff., ¶ 3.)

be Administratively Transferred.   (Id.)   On March 23, 2006, the Commission found that there was no probable cause and dismissed the charge.   (Id.)   The written decision notes that "the majority of the complaints are against Captain Kevin Campbell and not Lt. Hoover."   (Id.)   The Commission concluded that there was no causal connection between the 2000 discrimination charge and any retaliation, nor was race a factor in Plaintiff's transfer.   (Id.)

The third charge was filed on February 11, 2010 with the City's Equal Employment Opportunity department.   (Doc. 18, Evans Dep., Ex. 4.)   Plaintiff explained that Campbell discriminated against him based on race and retaliated against him. Specifically, Plaintiff complained of "[s]landerous remarks on performance ratings, false accusations harassment.   Order immediate supervisor to sign off on ratings that are false.   Retaliation due to complaints filed in previous years.   Encouraging charges to be filed in an incident he had nothing to do with."   (Id.)   As part of his charge, Plaintiff requested that Campbell not be allowed to return to his unit.   (Evans Aff. ¶ 2.)

Broach testified that he once asked Campbell why he was targeting Plaintiff, and Campbell told Broach that Plaintiff filed racial discrimination charges against him and "I need to get rid of him."   (Broach Dep. at 21.)

### E.  Termination

On July 3, 2010, Plaintiff left work due to stress.   (Doc.18, Evans Dep., Ex. 28.) The City claims that the decision to take Plaintiff off duty was made solely by Plaintiff. However, Plaintiff claims that he was constructively discharged.[9]   Plaintiff claims that the

_____

[9]Plaintiff also argues that he was terminated.   As discussed below, the City terminated

stress caused by the zero rating on his 2009 performance review forced him to leave work.  (Evans Dep. at 19.)

On January 5, 2011, Plaintiff filed a fourth charge of discrimination with the Ohio Civil Right Commission, claiming race discrimination and retaliation.  (Doc. 18, Evans Dep., Ex. 2.)  Plaintiff explained that he was currently on stress leave because of a poor review.  (Id.)  Plaintiff explained that the poor review was in retaliation for the discrimination charges he previously filed.  (Id.)

In a letter dated February 3, 2011, Plaintiff informed the City that according to his psychologist, he could return to "full firefighting duties beginning February 5, 2011 with a restriction."  (Doc. 28, Ex. 1.)  The restriction was that Plaintiff "cannot work under the direct or indirect supervision of captain [sic] Kevin Campbell."  (Id.)

In a letter dated February 7, 2011, Chief Texter informed Plaintiff that under City policy "[a]ny member of the Cincinnati Fire Department that has been on extended leave from their regular duty assignment for medical reasons is required to submit documentation from their treating physician detailing their medical status and prognosis for return to full duty."  (Evans Dep., Ex. 33.)  Texter explained that Plaintiff must provide documentation from his treating physician that he is able to "full unrestricted fire fighting duty."  (Id.)  Texter explained that if Plaintiff did not send a response or documentation within fourteen days "the separation process will begin on the 15th day."  (Id.)

In a letter dated February 24, 2011, Chief Texter informed Plaintiff that because he did not provide documentation the he could return to "Full Unrestricted Fire Fighting," his

---

Plaintiff because he could not return to full duty.

termination would be effective on February 25, 2011.  (Evans Dep., Ex. 33.)  Texter

explained that Plaintiff had been off duty since June 6, 2010, but did not take any action to

return to duty, seek appropriate care, or communicate his status to the City or Employee

Health Services.  (Id.)  In the letter, Texter references a conversation during a meeting

with Plaintiff that same day:

> . . . you stated that you could not return to a duty status without restrictions,
> nor would you be pursuing a disability retirement.  You requested that the
> Cincinnati Fire Department allow you to return to duty with the precondition
> that you would not have to work directly or indirectly under the supervision
> of Captain Kevin Campbell.  This request is totally unacceptable.  The
> Cincinnati Fire Department will not agree to or consider any preconditions to
> a return to duty, it is and has been a long standing policy of the Cincinnati
> Fire Department that all fire fighters MUST be 100% capable of working in a
> capacity as a Full Unrestricted Fire Fighter from the Fire Chief to the newest
> fire fighter.

(Id.)

Plaintiff claims that on February 24, 2011, he told text Texter that he could return to

work with no restrictions and could have incidental contact with Campbell.  (Evans Aff., ¶

9.)  Plaintiff claims he informed Texter he would need a couple of days to obtain a letter

from his psychologist.  (Id.)  Plaintiff explains that he was terminated the next day.  (Id.)

Plaintiff claims that Campbell was involved in his termination because on February

25, 2011, Texter emailed a copy of the February 24th letter terminating Plaintiff.  (Doc.

28, Ex. 31)  Texter stated that it was "for your eye [sic] only" and instructed Campbell to

"NOT disseminate to anyone else."  (Id.)  Campbell replied to the email and asked

whether the letter was sent certified mail.  (Id.)

In a letter dated March 8, 2011 from Plaintiff's attorney, it was reiterated to the City

that Plaintiff could return to work with no restrictions other than incidental contact with

15

Campbell.   (Doc. 28, Ex. 1.)[10]

## II.    ANALYSIS

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The moving party has the initial burden of showing an absence of evidence to support the non-moving party's case.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Once the moving party has met its burden, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

### B.    Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation,

---

[10]Plaintiff has represented to the Court that Texter admitted that Plaintiff could work for the Fire Department with only incidental contact with Campbell.   (Doc. 28, at 6.)   However, in the deposition transcript cited by Plaintiff, Texter says the exact opposite:

 . . . but if he can't work incidentally with Captain Campbell in the fire department,
then I guess he can't continue.   That's pretty much what he was told.

(Doc. 23, Texter Dep. at 34.)

16

proceeding or hearing under [Title VII]."   42 U.S.C. § 2000e–3(a).

The Sixth Circuit has held that "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997).   Therefore, only the City faces potential liability from Plaintiff's claims under Title VII.

### C.   Race Discrimination

In a case alleging employment discrimination in violation of Title VII, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive.   *Rallins v. Ohio State University*, 191 F.Supp.2d 920, 928 (S.D. Ohio 2002) (citing *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348-49 (6th Cir. 1997)).

Plaintiff insists that he has presented both direct and circumstantial evidence of race discrimination.   The Sixth Circuit has defined direct evidence as follows:

> "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."   *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).   "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."   *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).   "[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [national origin], but also that the employer acted on that predisposition."   *Hein v. All America Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).   Finally, "an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."   *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002).

*DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

The Court finds that Plaintiff has not presented direct evidence of race discrimination.   The only mention of race which Plaintiff has identified is the September 23, 2003 written report in which Campbell charged Plaintiff with insubordination. Campbell stated that "[i]n the past FF Evans has used race as an issue."  (Doc. 20, Campbell Dep., Ex. 5.)   Campbell suggested that "[t]his issue should be eliminated now, by putting FF Evans under the direct supervision of an African American Fire Officer." (Id.)   Plaintiff has not explained how putting Plaintiff under the direct supervision of an African-American officer is discriminatory.   Moreover, Plaintiff was not placed under the supervision of Broach until 2006.

Where no direct evidence of discrimination exists, a claim of employment discrimination is to be analyzed using the burden-shifting approach first announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).   To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees."   *DiCarlo*, 358 F.3d at 415.

If the plaintiff succeeds in establishing a *prima facie* case, an inference of discrimination arises, and the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its actions.   *Burdine*, 450 U.S. at 254-56.   If the

defendant articulates a nondiscriminatory reason for its actions, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons put forth by the defendant were not its true reasons but were a mere pretext for discrimination.  *McDonnell Douglas*, 411 U.S. at 802.

The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action.  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  "Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate."  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

The City concedes that Plaintiff is a member of a protected class.   The City argues that Plaintiff was not qualified for his position due to his inability to return to full firefighting duties without restrictions.   Plaintiff argues that he did provide documentation of a full release, albeit twelve days after he was terminated.   Plaintiff also responds that the City's requirement that he be able to perform full firefighting duties is pretext for discrimination because there is no written policy to that effect and the contract between the Union and the City of Cincinnati does not include this requirement.

Much of this discussion about pretext is unnecessary as a part of this claim. While Plaintiff has presented a whole host of examples of how he believes he was treated differently than other employees, these examples all occurred while he was an employee

19

and largely have no connection to his race. None of the examples are related to Plaintiff's termination or the City's purported requirement that he provide documentation of a full release. In other words, Plaintiff has not provided evidence that a similarly-situated, non-protected employee was allowed to return to work despite having some sort of restriction or after failing to provide certain documentation. Plaintiff has also failed to point to an employee outside the protected class who replaced him.

Similarly, Plaintiff has not demonstrated that he was treated differently than similarly situated employees on their performance reviews. The closest Plaintiff comes is his reference to Grauel, and Broach's testimony that on one occasion Grauel was not required to provide paperwork after he returned from sick leave. However, under the collective bargaining agreement, employees are only required to provide a doctor's note after "four (4) or more instances o[f] greater than seventy-two (72) hours of sick-leave [ ] within a rolling twelve (12) month period." Plaintiff has not provided any evidence that Grauel was required to provide paperwork under the collective bargaining agreement, but was excused from doing so.

Plaintiff also argues that other employees were late on paying off. However, Plaintiff does not dispute that he was late on paying off, and according to Campbell, other employees paid when they were reminded, and Plaintiff was the only employee who refused to pay.

Accordingly, the Court finds that Plaintiff has not established a *prima facie* case of race discrimination under Title VII, and the City is entitled to summary judgment on this claim.

**D.**   **Hostile work environment**

Plaintiff claims that since 2001, he was subjected to a hostile work environment based on his race.

The *McDonnell Douglas* burden-shifting approach also applies to hostile-work-environment claims. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).   A plaintiff can establish a *prima facie* case of a hostile work environment by showing (1) he is a member of a protected class; (2) he was subjected to unwelcomed racial harassment; (3) the harassment was race based; (4) the harassment unreasonably interfered with his work performance by creating an environment that was intimidating, hostile, or offensive; and (5) employer liability.   *Id.* (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).

While Plaintiff's claim of a retaliatory hostile work environment stands on different footing and will be discussed below, Plaintiff has not shown that any harassment was race based, or that but for his race, he would not have been the object of harassment.   *See Clay*, 501 F.3d at 706.   Instead, Plaintiff has argued that he was treated differently than other employees, and cites statements from fellow employees Donald Miles and Craig Boulding.   (Doc. 20, Campbell Dep., Exs. 2, 3).[11]   However, Plaintiff acknowledges that from 2005 to the time of his termination, the majority of the employees in Engine Company 34 were African American.   (Evans Dep. at 47.)   Therefore, the evidence only shows that Plaintiff was treated differently than all other employees, not just white employees.

---

[11]These statements refer to Hoover's treatment of Plaintiff, not Campbell's treatment.

Accordingly, Plaintiff has not established a *prima face* case of hostile work environment based on his race, and the City is entitled to summary judgment on this claim.

### E. Retaliation

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate by a preponderance of the evidence that (1) the plaintiff engaged in a protected activity under Title VII, (2) the plaintiff's protected activity was known to the defendant, (3) the defendant took adverse employment actions against the plaintiff, and (4) there was a causal connection between the adverse employment action and the protected activity. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). The Supreme Court has recently explained that with regards to the fourth element: "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013).

While Plaintiff is not entirely clear on this point, it appears that he is claiming he engaged in protected activity when he filed (1) the October 7, 2000 complaint with the Ohio Civil Rights Commission; (2) the October 24, 2005 complaint with the Ohio Civil Rights Commission; and (3) the February 11, 2010 complaint with the City's Equal Employment Opportunity department.

Plaintiff argues that there is direct evidence of retaliation because his revised 2007 performance report states: "Filed unsubstantiated charges against supervisor after

22

receiving reprimand in 2005."

Plaintiff has pointed to three adverse employment actions: low performance evaluations, denial of a transfer and his termination.   For an employment action to become actionable retaliation "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted)

The Sixth Circuit has explained that markedly lower performance-evaluation scores can support a retaliation claim only where the scores "significantly impact an employee's wages or professional advancement."   *Halfacre v. Home Depot, U.S.A., Inc.*, 221 Fed.Appx. 424, 433 (6th Cir. 2007).   Plaintiff has not shown that his performance reviews impacted his wages.   While Plaintiff has made an unsupported statement that a zero on a performance report prevents promotion, Plaintiff's overall ratings were still within a "normal range."   Plaintiff has not established that such a performance report significantly impacted his professional advancement.

Similarly, Plaintiff's alleged denial of a transfer does not support a claim for retaliation.   The Sixth Circuit has found that for purposes of a retaliation claim, the denial of a lateral transfer is not materially adverse where there is no impact on the employee's professional advancement.   *James v. Metro. Gov't of Nashville*, 243 F. App'x 74, 79 (6th Cir. 2007).   Plaintiff has not shown that any denial of his request to be transferred to another fire house effected his professional advancement.

Finally, while Plaintiff's termination is materially adverse, it does not support a claim of retaliation. Plaintiff's third charge was filed on February 11, 2010. On July 3, 2010, Plaintiff left work due to stress. Plaintiff was terminated on February 25, 2011, almost a year after he filed his charge, because according to the City, Plaintiff did not provide documentation the he could return to "Full Unrestricted Fire Fighting." The Sixth Circuit has explained that "[o]ne way by which a plaintiff can demonstrate a causal connection is to show close temporal proximity between the adverse employment actions and the protected activity." *Taylor*, 703 F.3d at 339. However, where a *prima facie* case is based on temporal proximity alone, the proximity of time must be a short period of time, "usually less than six months." *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (noting that fact of temporal proximity alone was not particularly compelling, because plaintiff's retaliation case was otherwise weak, and there was substantial evidence supporting the defendant's version of the events).

However, on January 5, 2011, Plaintiff filed a fourth charge of discrimination with the Ohio Civil Right Commission. This charge was less than two months before his termination.

As the Supreme Court has recently made clear, Plaintiff must show that his termination "would not have occurred in the absence of the alleged wrongful action or actions" of the City. Plaintiff cannot establish but-for causation in this instance. Plaintiff informed the City that he could return to full firefighting duties as long as he did not work under the direct or indirect supervision of Campbell. Texter's response, on behalf of the City was:

24

> This request is totally unacceptable. The Cincinnati Fire Department will not agree to or consider any preconditions to a return to duty, it is and has been a long standing policy of the Cincinnati Fire Department that all fire fighters MUST be 100% capable of working in a capacity as a Full Unrestricted Fire Fighter from the Fire Chief to the newest fire fighter.

Plaintiff does not dispute that he was unable to return to work without restrictions.

Moreover, it is well established that "the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992). Plaintiff has not provided any evidence to refute Texter's statement that it is the Cincinnati's Fire Department's policy that all fire fighters must be "100% capable of working in a capacity as a Full Unrestricted Fire Fighter."

Therefore, the Court finds that the City is entitled to summary judgment on Plaintiff's claim of retaliation. However, as discussed below, the City is not entitled to summary judgment on Plaintiff's claim of retaliatory hostile work environment.

### F.   Retaliatory Hostile Work Environment

The Sixth Circuit has explained that to prevail on a Title VII claim of retaliatory hostile work environment a plaintiff must show that "(1) [he or] she engaged in activity protected under Title VII; (2) the defendant was aware that the plaintiff engaged in the protected activity; (3) the plaintiff suffered 'severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the . . . harassment.'" *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 707 (6th Cir. 2012) (quoting *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir.

25

2000). "The employer may also prove an affirmative defense to retaliatory harassment by a supervisor by demonstrating: '(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise.'" *Morris*, 201 F.3d at 793 (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).[12]

In support of his claim, Plaintiff relies heavily on Broach's testimony. Broach has stated that Campbell told him that Evans was one of the worst firefighters, and he intended to discipline Evans so he would be terminated. Broach has also stated that Campbell told him that he was targeting Plaintiff because he had filed racial discrimination charges and "I need to get rid of him."

Plaintiff also relies on this 2007 performance review, which Campbell admitted participated in preparing. The 2007 report states that Plaintiff "filed unsubstantiated charges against supervisor after receiving reprimand in 2005." This entry presumably refers to Plaintiff's October 24, 2005 charge filed with the Ohio Civil Rights Commission. The charge named Campbell, and the majority of the complaints were about him. Based on these statements and Broach's testimony, for purposes of a *prima facie* case, Plaintiff has established a "but for" causal connection between the charges filed by Plaintiff and the harassment by Campbell.

"[W]hether a hostile work environment exists depends on a number of factors,

---

[12]The City did not plead this affirmative defense in its Answer. (Doc. 2.) Moreover, the Court notes that On February 9, 2010, Plaintiff filed internal charges against Campbell claiming that he was coercing or ordering his immediate supervisor to include false comments and to give low marks "due to complaints I filed in previous years." (Doc. 28, Ex. 34.)

including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Harris*, 510 U.S. at 21-22). This Court is to consider the totality of circumstances to determine whether the alleged conduct is sufficiently severe or pervasive. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (explaining that "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether-taken together-the reported incidents make out such a case."). "Provided that an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

To establish a retaliatory hostile work environment, Plaintiff relies on the 2007 and 2009 performance reviews. Again, Campbell has admitted that he participated in preparing the 2007 performance report. While Campbell denies involvement in the 2009 review, there is a genuine dispute as to whether Kluesener was solely responsible for the review, or whether Campbell was involved. As a result of the 2009 review, Plaintiff went on stress leave. While the Court found that the performance reviews did not constitute

27

adverse employment actions for purposed of Plaintiff's retaliation claim, they are properly considered as retaliatory acts for purposes of Plaintiff's retaliatory hostile work environment claim. *Accord Allen v. Ohio Dep't of Job & Family Servs.*, 697 F. Supp. 2d 854, 904-05 (S.D. Ohio 2010).

However, with regard to the alleged denial of a transfer, Plaintiff has not provided evidence that it was Campbell who denied the transfer. In fact, Texter testified that only the fire chief has the authority to deny a transfer. (Texter Dep. at 27.)

Plaintiff also relies on the insubordination charge which Campbell issued in 2003 and the written reprimands for being late on payments in 2005 and 2007. While there is no record of a 2005 reprimand, there is evidence of the 2007 reprimand. Campbell testified that Plaintiff was the only employee for whom he had issued a written reprimand for being late on payments. Plaintiff explains that his 2003 reprimand was unfounded:

> We made a fire. . . . We all did particularly well that night from what I can recall. . . . Captain Campbell rode in charge for that day. Every now and then he would ride in charge. Change his unit shift, ride in charge. . . . And it was Chad Maly and myself. And everything went smoothly. Okay? Well, when we get back on the apparatus he said something to me about flaking out the hose. And I expressed to the captain that I did, all right. And he says well, it needs to be done differently. And after we get back into the firehouse, all right, no one's around. It's just captain and myself. We're in the kitchen. And I tell the captain I feel - I'm just -- can I speak with you captain. And I said, "With all due respect, sir, I feel that if I had saved 15 people, you would still find fault with me." [I was] [o]rdered into the office. All I was doing was expressing how I was feeling. Ordered into the office. . . . Insubordination. You made an accusation. Type up these chiefs reports. Next thing you know we're in a big meeting with himself, Chief Freel, Robert Howell, myself. All right? I'm expressing how I feel. Okay? Now I got a written counseling for insubordination for just expressing myself.

(Evans Dep. at 40-41.)

28

While these acts were somewhat infrequent, the Court notes that Plaintiff was out on leave for a three month period between October 2008 and January 2009 and another four month period between March 2009 and August 2009.   In addition, Campbell was working in another unit beginning in 2009 and ending in March 2010.

Plaintiff has also presented evidence of less severe, but more pervasive retaliatory acts.   For instance, Plaintiff claims that Campbell questioned him about his paperwork when he took sick leave.   Plaintiff also claims that Campbell treated him differently on a weekly basis.   (Evans Aff. ¶ 8.)   This Court has found that similar acts will support a claim of retaliatory hostile work environment.   *See Allen v. Ohio Dep't of Job & Family Servs.*, 697 F.Supp.2d 854, 903 (S.D.Ohio 2010) (supervisor "began communicating with [the plaintiff] only by email" and "generally treated [the plaintiff] with hostility").   While these types of acts alone would not support Plaintiff's claim, in combination with the performance reports and the written reprimand, this Court concludes that a reasonable juror could find that Campbell's behavior after Plaintiff filed his October 24, 2005 charge constituted severe or pervasive retaliatory harassment.

Accordingly, the City is not entitled to summary judgment on Plaintiff's claim of retaliatory hostile work environment.

### G.   Ohio Revised Code § 4112.02

The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112."   *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981); *see also Chandler v. Empire Chem.,*

29

*Inc.*, 650 N.E.2d 950, 954 (Ohio Ct. App. 1994) (explaining that federal law provides applicable analysis for reviewing retaliation claims).   However, the Ohio Supreme Court has held that under Ohio Revised Code Chapter 4112, "a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of R.C. Chapter 4112."   *Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782, 787-88 (1999).

Therefore, the Court finds that the City is entitled to summary judgment on Plaintiff's claims for discrimination, hostile work environment and retaliation under Ohio law; and is not entitled to summary judgment on Plaintiff's claim for retaliatory hostile work environment under Ohio law.  Because it is Campbell's discriminatory conduct which forms the basis of Plaintiff's claim for retaliatory hostile work environment under Ohio law, that claim remains pending against Campbell.  However, like the City, Campbell is entitled to summary judgment on all other state law claims.

Based on the foregoing, Defendant Kevin Campbell's Motion for Summary Judgment (Doc. 14) is **GRANTED in PART and DENIED in PART**; and Defendant the City of Cincinnati's Motion for Summary Judgment (Doc. 15) is **GRANTED in PART and DENIED in PART**.

**IT IS SO ORDERED.**

_/s/ Michael R. Barrett_
Michael R. Barrett
United States District Judge

30